**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
Indiana Department of Child Services
Tippecanoe County Office

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Jan 25 2012, 9:23 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.V., minor child, and Q.M.S., the mother, | ) ) ) ) | |
| Q.M.S., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 79A02-1105-JT-535 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta Rush, Judge
Cause No. 79D03-1010-JT-150

**January 25, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Q.S. ("Mother") appeals the involuntary termination of her parental rights to her child, K.V. In so doing, Mother challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

Mother is the biological mother of K.V., born in June 2009. The facts most favorable to the trial court's judgment reveal that, in March 2010, K.V. was removed from Mother's care and placed in relative foster care after the local Tippecanoe County office of the Indiana Department of Child Services ("TCDCS") substantiated a report that Mother and K.V.'s biological father, D.V. ("Father"), were addicted to heroin, did not have stable housing, and had engaged in a recent incident of domestic violence during which Mother physically struck Father.[1] Although Mother initially denied any substance abuse, she soon admitted to the TCDCS assessment caseworker that she had a heroin and prescription drug addiction and that both she and Father were homeless. Mother thereafter voluntarily entered a residential detoxification treatment program on March 18, 2010, and TCDCS filed a petition alleging K.V. was a child in need of services ("CHINS"). Approximately one week later, Mother was successfully discharged from the detoxification program.

Following an evidentiary hearing later the same month, K.V. was adjudicated a CHINS based on evidence of: (1) extensive substance abuse, with Mother's addiction dating back to the age of fourteen; (2) domestic violence between the parents; and (3)

---

[1] We observe that in April 2011, Father voluntarily relinquished his parental rights to K.V. Father does not participate in this appeal. Consequently, we limit our recitation of the facts to those pertinent solely to Mother's appeal.

2

lack of housing.  In April 2010, the trial court issued a dispositional order formally removing K.V. from Mother's custody and making the child a ward of TCDCS.  The court's dispositional order also directed Mother to participate in a variety of programs and services designed to address her parenting deficiencies and substance abuse issues in an attempt to facilitate reunification of the family.  Specifically, Mother was ordered to, among other things:  (1) refrain from consuming alcohol and possessing and/or consuming any legend drug or controlled substance without a prescription; (2) submit to random drug screens and produce clean test results; (3) successfully complete an intensive out-patient substance abuse program ("IOP"); (4) obtain and maintain stable housing and income (including public assistance) sufficient to support all household members; (5) participate in home-based case management services; and (6) exercise regular visitation with K.V. after producing a clean drug screen.

Mother's participation in court-ordered services was inconsistent from the beginning of the CHINS case and ultimately unsuccessful.  During the underlying proceedings, Mother was unsuccessfully discharged from three different residential substance abuse treatment programs for a variety of reasons including continued substance abuse, falsifying records, engaging in prohibited relationships with male residents, and being dishonest with case workers.  Additionally, TCDCS filed numerous show cause petitions against Mother for failing to comply with court orders.

In July 2010, Mother was found in contempt of court for failing to appear at a scheduled court hearing and was ordered either to enroll in a residential drug treatment program within ten days or serve thirty days in jail with a recommendation of work release.  By August 2010, Mother had failed to enroll in a treatment program, as directed,

3

and was thus found to be in contempt of court and ordered to serve thirty days in work release. During a subsequent hearing in October 2010, Mother was found in contempt of court for a third time, but she was incarcerated on an unrelated matter at the time so the sanction was taken under advisement.

Following her release from incarceration, Mother began participating in services at Keepin' It Real, Inc., a women's residential recovery house, as well as began participating in an IOP through Wabash Valley in November 2010. Initially, Mother positively engaged in treatment and produced negative drug screens in November and December 2010. She also successfully completed Phase I of the IOP and began Phase II, which focused on relapse prevention, in mid-January 2011. After the birth of her second child[2] in February 2011, however, Mother secretly obtained a prescription for opiate pain medication. Although Mother admitted her actions concerning the newly-obtained prescription, her treatment team deemed Mother's actions to be a relapse and recommended that she re-engage in Phase I of the IOP. Mother complied, but in March 2011 she tested positive for THC[3] and was thereafter terminated from all Wabash Valley Allied services, including the Keepin' It Real, Inc. residential program. The same month, Mother was arrested on a petition to revoke her probation as a result of the positive drug screen.

Meanwhile, in October 2010, TCDCS filed a petition seeking the involuntary termination of Mother's parental rights. A two-day evidentiary hearing commenced in January 2011 and was continued in April 2011. During the termination hearing, TCDCS

---

[2] Mother's second-born child is not a party to these proceedings.
[3] Tetrahydrocannabinol, commonly referred to as "THC," is the main active chemical in marijuana.

presented evidence showing that Mother remained incarcerated on pending probation revocation charges and had failed to successfully complete and/or benefit from a majority of the court-ordered reunification services, including substance abuse treatment. At the conclusion of the termination hearing, the trial court took the matter under advisement. On April 19, 2011, the court entered its judgment terminating Mother's parental rights to K.V. This appeal ensued.

## DISCUSSION AND DECISION

When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

5

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \*

(C)    that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-

6

8(a). Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) & (C) of the termination statute cited above.

## I. Conditions Remedied/Threat to Well-Being

To properly effectuate the termination of parental rights under Indiana Code section 31-35-2-4(b)(2)(B), the trial court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See e.g., L.S.*, 717 N.E.2d at 209. Here, the trial court determined that the first two elements of subsection (b)(2)(B) had been established. Because we find it to be dispositive under the facts of this case, however, we shall only discuss whether TCDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in K.V.'s removal or continued placement outside of Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be

7

remedied. *Id.* Moreover, TCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

On appeal, Mother states that "[s]everal of the conditions resulting in K.V.'s removal have been remedied," and that the "rest will be remedied with more work by [Mother]" following her eventual release from incarceration. *Appellant's Br.* at 11. Mother further contends that because she is "now putting forth genuine effort" and is "highly motivated to do what is necessary to be a good mother to K.V.," the trial court erred in terminating her parental rights to K.V. *Id.* In terminating Mother's parental rights, the trial court made extensive findings regarding the "massive amounts of individual attention, services, and assistance" Mother received throughout the underlying proceedings in an attempt to help Mother overcome her parenting and substance abuse issues and to achieve reunification with K.V. *Appellant's App.* at 15. In so doing, the court noted Mother was "unsuccessfully discharged from three (3) different residential programs" in June 2010, August 2010, and April 2011. *Id.* at 13. The court further found Mother was unsuccessfully discharged from and/or failed to attend multiple out-patient drug treatment programs as well, including the St. Joseph Trinity House IOP in April 2010, Wabash Valley Matrix IOP in Lafayette in July 2010, IOP treatment through Turning Point in July/August 2010, and Wabash Valley IOP in Delphi in February 2011.

Additional findings by the trial court indicate that Mother "has had numerous suicide attempts and hospitalizations," including episodes in 2007, 2009, and 2010, as well as inpatient hospitalization at the Home Hospital Psychiatric Unit in June 2010, but

8

that she has "failed to follow through with her mental health treatment." *Id.* at 14. The court also found Mother "has never been able to maintain any employment" and has not had "any stable housing during the case," having lived in "at least four (4) substance abuse facilities, the Woman's Shelter, jail on numerous occasions, and with family." *Id.*

As for Mother's involvement in criminal activities, the trial court found Mother "has been in jail on several occasions during the pendency of the case for continued substance abuse," that "[a]ll of Mother's criminal cases have involved Mother's drug use," that she was "currently in jail on a petition to revoke probation and is being held without bond." *Id.* In recounting Mother's criminal history, the court further noted that, following Mother's guilty plea in 2009 for Class D felony theft, three separate petitions to revoke her probation were filed in February 2010, September 2010, and March 2011. Mother served forty-two days of incarceration on the first violation, an additional seventy-six days on the second violation, and was awaiting a hearing on the third. Additionally, Mother pleaded guilty to disorderly conduct under a separate cause number in April 2010 and was sentenced to one-hundred eighty days incarceration. Although Mother's sentence was ordered suspended based on her timely completion of the terms and conditions of probation, she failed to comply with the terms of her probation, and a second probation revocation hearing was pending at the time of the termination hearing in this matter as well.

Although the trial court acknowledged in its judgment that Mother is "very intelligent, loves [K.V.], and could be a good mother," it further found that "over the course of the . . . CHINS case, Mother has demonstrated a lack of insight into the reasons [why] K.V. was removed from her care and a lack of genuine investment in her own

9

services as evidenced by the following: Mother's relationship with a man who is participating in the work release program and is struggling with drug issues, a subsequent pregnancy, and her own continual drug usage." *Id.* at 15. The court went on to find:

26. Neither parent understands how their complete lack of commitment to treatment, recovery, services, visitations, and their rampant dishonesty impact [K.V.]. Mother and Father chronically put their own needs ahead of those of [K.V.].

* * *

29. The Court finds, as a matter of law, that reasonable, appropriate, necessary services have been offered to Mother . . . and child over an extended period of time commencing with the initial removal [i]n March 2010 to date. The services have been exhaustive and have been designed to address the difficulties presented by the family in the initial CHINS petitions . . . and to address other difficulties that have come to light since [TCDCS] became involved with this family. . . .

30. The Court finds, as a matter of law, that after more than thirteen (13) months of rendering services of various kinds with different providers to this family, that there is not any basis for any reasonable belief that the circumstances which resulted in the removal of the child from the parent's care or the reasons for continued placement outside the home will be remedied. Mother has demonstrated a continuing pattern of impulsive behavior, continued drug use, non-compliance, failure to participate consistently in services, and an over-riding failure to place her child as a priority. Mother does not indicate that she has a basic understanding or belief of the harm her child has suffered given her choices and instabilities in her own life. Mother, therefore, is unable to provide a minimally safe, secure, and stable home for this child.

*Id.* at 15-16. Our review of the record leaves us convinced that ample evidence supports the trial court's findings cited above.

At the time of the termination hearing, rather than having improved, Mother's circumstances had actually worsened, as she was being held without bond in the local county jail on criminal probation revocation charges. Moreover, Mother's history of

drug-related criminal activities and significant, unresolved substance abuse issues supports the trial court's determination that Mother would likely never be able to provide K.V. with a safe and stable home environment following her eventual release from incarceration. Notwithstanding Mother's brief period of compliance with court orders and substance abuse treatment, it was the general consensus among case workers and service providers that by the time of the final day of the termination hearing, Mother had failed to acquire any lasting benefit from the services she participated in and had exhausted TCDCS's available services. For example, during the termination hearing, TCDCS case manager Robert Hall ("Hall") testified that this was one of the "rare" cases where Mother had participated in "most of the substance abuse programs in Tippecanoe County" and "the surrounding counties for that matter." *Tr.* at 132. Hall further stated that he did not believe there were any "more intense or more supportive" case management services available to recommend for Mother. *Id.*

Jackie Partlow, Executive Director of Keepin' It Real, Inc., and Steve Stone ("Stone"), Mother's therapist and licensed clinical addictions counselor with Wabash Valley Alliance, both confirmed that despite her initially positive start with services offered through Keepin' It Real, Inc., and the IOP program in November 2010, Mother experienced a "relapse" following the birth of her second child by "covertly" obtaining a prescription for an "opioid" pain medication in February 2011 and then testing positive for THC in March 2011. *Id.* at 15, 20, 61-62. Stone further testified that in light of Mother's "significant opioide (sic) depend[ent] lifestyle" and "extensive use and reuse history," he believed Mother would need to participate in a "long[-]term residential

11

program" for at least one year at a "closed" residential facility to overcome her addiction issues. *Id.* at 15, 36.

In recommending termination of Mother's parental rights, court-appointed special advocate ("CASA") Sharon Cornell ("Cornell") informed the trial court that based on "the number of treatment programs that [Mother] has tried and has been unsuccessful for one reason or another in completing[,] I don't think [Mother] recognizes her triggers or the behaviors that might lead her to be triggered or to use again." *Id.* at 148-49. Cornell further informed the trial court that she had ongoing concerns regarding Mother's ability to maintain "long-term stability, both with her sobriety as well as her maintaining employment, housing, [and] all of the appropriate necessities to raising a child." *Id.* at 151.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, in addition to Mother being unavailable to care for K.V. at the time of the termination hearing due to her incarceration, Mother has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show she is capable of overcoming her addiction to heroin and opiates and of refraining from criminal activity in order to provide K.V. with the safe, stable, and drug-free home environment the child needs. Based on the foregoing, we conclude that the trial court's determination that there

is a reasonable probability the conditions resulting in K.V.'s removal from Mother will not be remedied is supported by clear and convincing evidence. Mother's assertions to the contrary amount to an impermissible invitation to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's assertion that TCDCS failed to prove that termination of her parental rights is in K.V.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by TCDCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to K.V.'s best interests. Specifically, the court found that K.V. has been "in and out of home placement for the majority of her life" that she has "bonded" with her pre-adoptive relative placement and cousins. *Appellant's App.* at 15. The court also acknowledged CASA Cornell's testimony that she believes "K.V. needs the permanency, stability, and security that she is receiving in her current relative

placement." *Id.* Finally, in finding that it "would not be in the best interests of the child to try to reunite this family," the trial court indicated in its judgment that "[f]urther efforts to reunify will have continuing deleterious effects on [K.V.]," and that an "appropriate adoptive home" would "enable [K.V.] to grow up to be a responsive and capable adult who is able to participate and interact in society in a positive way." *Id.* at 16. These findings, too, are supported by the evidence.

In recommending termination of Mother's parental rights, Hall and Cornell testified that K.V. is "doing wonderful[ly]" in her adoptive home, is "bonded" to her relative foster parents, "fits right in" with the other children in the home, and is "very happy." *Tr.* at 65, 151. When questioned as to what she believed the long-term affect would be on K.V. if she were returned to Mother's care and then Mother relapsed, Cornell replied, "I think it would be very devastating . . . ." *Id.* at 152

Based on the totality of the evidence, including Mother's significant and unresolved substance abuse issues, history of drug-related criminal activities, current incarceration, and continuing inability to provide K.V. with a safe and stable home environment, coupled with the testimony from Hall and Cornell recommending termination of the parent-child relationship, we conclude that there is ample evidence to support the trial court's determination that termination of Mother's parental rights is in K.V.'s best interests. *See*, *e.g.*, *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence that termination is in child's best interests), *trans. denied*.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BARNES, J., and BRADFORD, J., concur.